EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525

Attorneys for Plaintiff A.O., by and through her guardian *ad litem*, VICTORIA
JUAREZ

GRACE JUN (SBN 287973)
grace@gracejunlaw.com
501 W Broadway, Ste. 1480
San Diego, CA 92101
TEL: (619) 841-1408

Attorney for Plaintiff JULIE RUFFIN

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEDRO JUNIOR ORNELAS III, Decedent, by and through his successor in interest, A.O., a minor, by and through her guardian *ad litem*, Victoria Juarez; A.O., in her own right; and JULIE RUFFIN, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO; NAPHCARE, INC.; NAPHCARE OF SAN DEIGO, LLC; MARIA TAMAYO, an individual; and DOES 1-10, <br><br> Defendants. | CASE NO. **'25CV1659 JLS MSB** <br><br> **COMPLAINT** <br><br> 1) **Pretrial Detainee's Claim re: Conditions of Confinement and/or Medical Care (42 U.S.C. §1983)** <br> 2) **Deprivation of Right of Association (42 U.S.C. § 1983)** <br> 3) ***Monell* municipal liability (42 U.S.C. § 1983)** <br><br> **JURY TRIAL DEMANDED** |

COME NOW Decedent PEDRO JUNIOR ORNELAS III, by and through his successor in interest A.O., decedent's minor daughter, by and through her guardian ad litem, Victoria Juarez; A.O., in her own right; and Julie Ruffin, decedent's mother, to allege and complain as follows:

# I. INTRODUCTION

1.     Pedro Junior Ornelas III ("Pedro Junior") was beloved by his mother, Julie Ruffin, and adored by his minor daughter, A.O.



2.     Pedro Junior had a long history of mental health issues and had previously attempted suicide. His mental health history, and his previous suicide attempts, were stored and documented within the San Diego County Sheriff's Departments own medical record-keeping system. Pedro Junior had previously been prescribed psychiatric medication while incarcerated at the County Jails, which was also documented in his medical chart.

3.     On On June 16, 2023, Pedro Junior was booked into the San Diego County Central Jail. The nurse who conducted the medical receiving/screening process had access to his medical records and chart from previous incarcerations. Despite his history of mental health issues and history of psychiatric care, Pedro Junior was not evaluated by a mental health clinician or referred to a psychiatrist.

4.     The next day, on June 17, 2023, he made two separate requests for a psychiatric evaluation and asked to be placed on medication. Although the Sheriff's Department received and processed both requests for medical assistance, no one actually responded to Pedro Junior's requests for help. He did not see any psychiatrist or other medical provider. He did not receive his psychiatric medication.

5.     On June 26, 2023, Pedro Junior hung himself. He was only 27 years old at the time of his death.

6.     Pablo Stewart, M.D., a correctional healthcare expert and psychiatrist, reviewed Mr. Ornelas' medical records as part of his expert review and report in the class action matter of *Darryl Dunsmore et al. v. San Diego County Sheriff's Department et al.*, S.D. Cal. case no. 20-cv-00406.  Dr. Stewart noted Pedro Junior "repeatedly requested to see a psychiatrist to 'get back on my medications' – requests that were *never* addressed through initial screening or subsequent processes." (Emphasis in original.) Dr. Stewart noted that Pedro Junior's death was an "egregious example" of deficiencies in the mental health intake screening process at San Diego County Jails. Pedro Junior died by suicide after "spending nearly two weeks without necessary attention paid to his obvious psychiatric treatment needs or necessary monitoring."

## II. JURISDICTIONAL ALLEGATIONS

7.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), et. seq.

8.     Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District of California.

9.     At all times relevant to this complaint, decedent Pedro Junior Ornelas III ("Pedro Junior") was an individual residing in San Diego County, California.

10.    At the time of his death, Pedro Junior was not married.  He had one child, a daughter, A.O. who was born on 4/27/2016 and was 7 years old when Pedro Junior died. Pedro Junior did not leave behind any will or other testamentary document.  He died intestate.  For this reason, there is no probate proceeding pending related to Pedro Junior Ornelas III. As his surviving child, A.O. is Pedro

Junior's heir and beneficiary. Thus, she is his successor-in-interest under California law and succeeds to the decedent's interests, claims, and causes of action. There is no other person with a superior right to commence the action. *See* Cal. Civ. Proc. Code § 377.30. A.O. is represented by her guardian ad litem, Victoria Juarez, who is A.O.'s natural mother and custodial parent. The declarations of Victoria Juarez and Julie Ruffin establishing A.O. as successor in interest to decedent Pedro Junior Ornelas III are filed concurrently with this complaint and incorporated herein by reference. The death certificate of Pedro Junior Ornelas III is attached hereto as Exhibit 1.

## III.   PARTIES

11.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

12.    Minor plaintiff A.O. is the only daughter of decedent Pedro Junior Ornelas III ("Pedro Junior" or "decedent").

13.    Plaintiff Julie Ruffin is the mother of decedent.

14.    Defendant County of San Diego is a public entity, duly organized and existing under the law of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority.  The Sheriff's Department owns, operates, and manages the San Diego Central Jail and other County jail facilities and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of the Central Jail and its respective employees, contractors and/or agents who staff the Central Jail.

15.    At all times relevant to this complaint, NAPHCARE, INC. and/or NAPHCARE OF SAN DEIGO, LLC, (collectively, "NAPHCARE") was the third-party contractor responsible for providing medical and mental health services to inmates in the custody of the San Diego County Sheriff's Department who may

have employed, supervised, and/or trained certain individual defendants in this case.

16.    Defendant MARIA TAMAYO was a registered nurse (RN) employed by the County of San Diego Sheriff's Department who conducted the medical receiving/screening at the Central Jail for decedent Pedro Junior. TAMAYO was responsible for identifying Pedro Junior's medical and mental health needs and ensuring he received appropriate care for those needs.

17.    Defendant DOES 1-5 were medical and/or mental health personnel at the Central Jail who were responsible for responding to Pedro Junior's two separate requests for psychiatric assistance and medication, which he submitted on June 17, 2023. DOES 1-5 were responsible for responding to Pedro Junior's requests; alerting Pedro Junior about what steps would be taken in response to his requests; referring Pedro Junior to the appropriate psychiatrist and treatment provider; and ensuring Pedro Junior was seen by the psychiatrist and treatment providers by establishing timely appointments. DOES 1-5 may include private contractors who are employees of NAPHCARE.

18.    Defendants DOES 6-10, inclusive, are persons whose identities, titles, and employment/agency relationships are currently unknown to Plaintiffs; that is, they are currently ignorant of the true names of these persons.  These defendants include jail staff, detention officers, JPMU ("classification") officers, medical staff, medical providers, mental health staff, mental health providers, supervisors, employees, agents, contractors, and final policymakers who substantially contributed to the acts and omissions giving rise to the damages claimed herein. These defendants include personnel responsible for developing policies and procedures to ensure care for inmates who need extensive medical and mental health assistance, such as Pedro Junior. This includes the Chief Mental Health Clinician, and contracted mental health care professionals (psychologists and psychiatrists). DOES 6-10 were responsible for ensuring that appropriate policies

and procedures were in place, and that Pedro Junior received psychiatric care given his history of mental health issues, his history of suicide, and his explicit requests for psychiatric care. DOES 6-10 may include private contractors who are employees of NAPHCARE.

19. These DOE defendants each acted under color of state law, within the scope of their agency and/or employment, and with the full knowledge and consent, either express or implied, of their principal and/or employer. Plaintiffs are genuinely ignorant of the identities of DOES 1-10 as none of the medical records or other documentation provided to Plaintiffs by the Sheriff's Department identifies these DOES. Plaintiffs will seek leave to substitute the true names of these defendants when they learn their true identities.

20. Plaintiff names Defendant DOES 1-10 for the purposes of allowing "relation back" under Fed. R. Civ. P. 15(c)(1)(A). The Advisory Committee Notes to the 1991 amendment to Rule 15(c) states that a new subdivision (currently Rule 15(c)(1)(A)) was added "to make it clear that the rule does not apply to preclude any relation back that may be permitted under the applicable limitations law." If the forum state law "affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." *Id*. Plaintiff's reference to Defendant "Does" in their complaint is made to allow relation back to the filing date of the original complaint if an amended complaint is submitted after the expiration of the statute of limitations. To avail herself of California's more liberal relation back rule under Rule 15(c)(1)(A) under *Butler v. Nat'l Cmty. Renaissance of California*, 766 F.3d 1191, 1201 (9th Cir. 2014), Plaintiff must plead the existence of Doe Defendants under California's fictitious name statute, Code Civ. Proc. § 474. If Plaintiff does not plead "Does" they will be precluded under Code Civ. Proc. § 474 from relating back any claims. *See Audrey G. v. City of Lafayette*, No. 21-CV-03545-WHO, 2022 WL 16528143, at *7 (N.D. Cal. Oct. 28, 2022) (finding that California's relation back standard governed under Fed. R.

6
COMPLAINT

Civ. P. 15(c)(1) but holding plaintiff failed to meet California's standard by failing to name fictitious Doe defendants).

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

21.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

22.    Pedro Junior suffered from depression and anxiety. He took Zoloft and Seroquel (an antipsychotic medication) for anxiety, depression, and mania. Pedro Junior reported hearing whispers and voices and suffered from chronic insomnia. He took Abilify for insomnia.

23.    Pedro Junior's mental health history was well-documented in the San Diego County Sheriff's Department's jail system. Pedro Junior had previously been placed in San Diego County Jails on October 2, 2019. He reported suffering from anxiety and insomnia and requested to be continued on his medication, including Seroquel. On October 4, 2019, medical doctor, Dr. Leon, noted Pedro Junior suffered from anxiety and agoraphobia and needed to be seen by a psychiatrist.

24.    Pedro Junior informed the County Jail that he received behavioral health services at the Douglas Young Clinic, a San Diego County Mental Health Services facility. His records from Douglas Young were sent to the County Jail.

25.    The records from Douglas Young, which were scanned in and became a part of Pedro Junior's medical chart at the County Jail, documented Pedro Junior's mental health history. The Douglas Young clinic notes reflect that Pedro Junior reported previously attempting to hang himself, stating, "the hook broke, so that was stupid." He further reported that he had been twice hospitalized for psychiatric concerns, including hospitalizations at Aurora and Sharp Mesa Vista. Pedro Junior also reported that he had a history of cutting himself.

26.    Throughout his 2019 incarceration at San Diego County jails, Pedro Junior submitted repeated requests for "immediate psych eval" because the "voices

are louder and I can't sleep." Pedro Junior reported crying every night in isolation, as he feared that being seen as tearful and weak would make him vulnerable within his housing unit. He reported waking up at night gasping for breath. Pedro Junior was prescribed bupropion, an antidepressant and Seroquel (quetiapine furmarate) by a provider working for the Sheriff's Department. He was seen weekly by mental health clinicians due to his depression.

27. Pedro Junior had a "flag" within the San Diego County Jail system that stated "Behavioral Health Services" meaning he required mental health services.

28. Additionally, during Pedro Junior's confinement with the San Diego County Sheriff's Department, he called his mother, Julie Ruffin, to report that he was going to kill himself. Pedro Junior's mother immediately called the jail and notified them that her son had expressed thoughts of suicide. Upon information and belief, Pedro Junior was placed on suicide watch due to Ms. Ruffin's phone call.

29. On June 16, 2023, Pedro Junior was booked into the San Diego County Central Jail. Defendant MARIA TAMAYO was the gatekeeper nurse responsible for screening and assessing Pedro Junior's serious medical and mental health needs. Pedro Junior did not report taking any psychiatric medications and denied previous psychiatric hospitalizations. As part of the medical intake process, the San Diego County Sheriff's Department utilizes the "Columbia-Suicide Severity Rating Scale" to assess an individual's risk of suicide. Pedro Junior answered "NO" to the following questions :

    a. Have you wished you were dead or wished you could go to sleep and not wake up?

    b. Have you had any actual thoughts of killing yourself?

    c. Have you ever done anything, started to do anything, or prepared to do anything to end your life?

8
COMPLAINT

30. Pedro's responses during the intake process were not consistent with his medical history. Patients entering a correctional system frequently deny thoughts of suicide and refuse to report history of suicide and self-harm because the inmate-patients fear placement in restrictive housing and the loss of privileges. Thus, suicide risk assessments cannot rely exclusively on self-reporting of risk by the patient.

31. Pedro Junior's medical records from his previous detentions at the San Diego County Jails, including his 2019 detention, remained in the medical software system and were available to all medical staff who interacted with him in 2023. He had a previous flag or alert in the Sheriff's Department system indicating he received mental health services. His medical records indicated that he had previously been prescribed bupropion, an antidepressant and Seroquel, an antipsychotic, when he had been at the County Jail. Upon information and belief, Pedro Junior had previously been placed on suicide watch due to the intervention of his mother, Julie Ruffin. This should have caused placement of an alert or flag in the Sheriff's Department's record-keeping system due to these previous suicide precautions.

32. Defendant TAMAYO, however, did not reference Pedro Junior's previous mental health history or suicide precautions. There is no indication that TAMAYO or anyone else reviewed Pedro Junior's medical chart or medical history. Although TAMAYO was required to review Pedro Junior's record for "alerts" or "flags" she did not document that she had conducted any review of his medical records for such information.

33. The next day, on June 17, 2023, Pedro Junior submitted two separate medical "sick call" request forms. He stated, "May I see the psych please for a re-evaluation to get back on my medication." In the second request, Pedro Junior stated, "I have a request to be seen by the psych so I may get back on my meds please."

9
COMPLAINT

34.    Both of Pedro Junior's requests for psychiatric assistance were documented in Pedro's medical chart, indicating medical staff had seen his request. The medical record does not indicate who saw these requests for medical services and when the person(s) saw and documented these requests. But no one responded to Pedro Junior's requests. The portion of the medical requests form that is supposed to be completed by medical staff, indicating what action was taken, when it was taken, and by whom the action was completed, was blank. The portion of the forms that are to be completed to medical staff notifying the patient what steps would be taken are blank. These portions were blank on both requests submitted by Pedro Junior.

35.    The Sheriff's Department's policy requires inmate medical sick call requests to be responded to as follows:

1.  All individual Sick Call Request Forms shall be dated when received by stamp or hand written by a designated medical staff.
2.  An RN shall triage all the sick call request forms received within 24 hours based on record review.
3.  A face to face nursing assessment is to be conducted within 24 hours of receiving requests. Request for mental health services are triaged and scheduled to Mental Health for review and follow-up.
4.  A patient should be advised that their request(s) will be evaluated, and they will be scheduled to be seen by medical staff according to the seriousness of the complaint.
5.  A designated medical staff member will schedule the patient for RNSC (registered nurse sick call).

36.    Pedro Junior's medical request forms are not dated as to when they were received. There is no indication that anyone reviewed Pedro Junior's records. He did not receive any "face to face" assessment within 24 hours. There is no indication that Pedro Junior's requests were reviewed by any mental health

clinician, or that any mental health clinician reviewed his mental health history which was documented within the Jail's own record keeping system.

37. DOES 1-5 were the medical and/or mental health personnel at the Central Jail who were responsible for responding to Pedro Junior's requests for psychiatric assistance but who failed to take any action in response to Pedro Junior's requests for help. Although Pedro Junior had a history of taking Seroquel and anti-depressants while incarcerated at the County Jails, no effort was made to continue Pedro Junior on his psychotropic medication.

38. DOES 6-10 were responsible for ensuring that appropriate policies and procedures were in place, and responsible for providing Pedro Junior with psychiatric care and prescription medication given his history of mental health issues, his history of suicide, and his explicit requests for psychiatric care.

39. Pedro Junior decompensated without psychiatric assistance. He began collecting plastic sandwich bags and made a noose or rope using the plastic bags. Pedro Junior's cellmates found the plastic bags and immediately confiscated them.

40. On June 26, 2023, deputies found Pedro Junior hanging by a ligature in his jail cell. He was alone in that cell. Pedro Junior was not responsive. He was transported to the UCSD Medical Center for further treatment. But his condition deteriorated. On June 28, 2023, Pedro Junior died.

41. Dr. Pablo Stewart is a psychiatrist and correctional health expert who has been retained by the plaintiffs in in the *Dunsmore* class action case against the Sheriff's Department currently pending in the Southern District of California (case no. 20-cv-00406-AJB-DDL). Dr. Stewart testified before the three-judge panel in the consolidated matters of *Coleman v. Brown* and *Plata v. Brown* related to overcrowding in California prisons. In *Brown v. Plata*, 563 U.S. 493 (2011) Supreme Court upheld the decision of the three-judge panel ordering reductions in California's prison population and cited Dr. Stewart's work. *See id*. at 519 n.6 and 522.

42.    As part of his work in the *Dunsmore* class action matter, Dr. Stewart reviewed the medical records of Pedro Junior. He issued a Rule 26 expert report noting deficiencies in the care of Pedro Junior. Dr. Stewart opined that the initial screening of Pedro Junior which indicated no mental health history was an "appalling and consequential screening failure." Records from Pedro Junior's previous incarceration at San County Jails, which Sheriff's Department personnel were able to access and review, evidenced his extensive mental health history.

43.    Dr. Stewart further noted that following his arrival at the Jail, Pedro Junior made two separate requests to see a psychiatrist. "These requests were *never* addressed: the staff portion of the forms were never completed and mental health staff never assessed him." (Emphasis in original.)

44.    According to Dr. Stewart's Rule 26 report, after Pedro Junior's death, NAPHCARE conducted a review of his death. NAPHCARE, a private contractor, employed medical and mental health professionals at the Central Jail during the time of Pedro Junior's death. NAPHCARE's recommendation upon review of Pedro Junior's death was "Closer Psychiatric follow-up/care." Dr. Stewart wrote, "[f]or a case where there was *zero* psychiatric care provided despite documented psychiatric history available to Jail staff and multiple requests for such care, this finding is a gross understatement." (Emphasis in original.)

# V. CAUSES OF ACTION

## A. FIRST CAUSE OF ACTION

**Violation of Fourteenth Amendment (42 U.S.C. § 1983) Pretrial Detainee's Claim re Conditions of Confinement and/or Medical Care (42 U.S.C. §1983) [By A.O., as successor in interest to Decedent Pedro Junior Ornelas III, against Defendants TAMAYO AND DOES 1-10]**

45.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

46.    As set forth in the preceding paragraphs, which are incorporated herein by reference, individual defendants TAMAYO and DOES 1-10 failed to properly treat and monitor Pedro Junior's serious medical condition despite having access to his medical chart, which documented his history of suicide, his risk of suicide, and his mental health history.

47.    Given their access to Pedro Junior's mental health history, and given his explicit requests for psychiatric assistance, Defendants TAMAYO and DOES 1-10 were deliberately indifferent to Pedro Junior's serious medical needs.

48.    As a direct and proximate result of Defendants' deliberate indifference to Pedro Junior's serious medical condition, he experienced physical pain, severe emotional distress, and mental anguish, as well as the loss of his life and other damages as alleged herein.

49.    The conduct alleged herein caused decedent to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and caused decedent to suffer emotional distress, pain and suffering and death and further damages all in an amount to be shown according to proof at the time of trial.

50.    The conduct as alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights, justifying the award of exemplary damages against defendants in an amount to be shown according to proof at the time of trial to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.

51.    Plaintiff is also entitled to an award of attorney fees and costs of suit.

///
///
///
///
///

13
COMPLAINT

## B. SECOND CAUSE OF ACTION

### Right of Association (42 U.S.C. § 1983)
### [By Plaintiff A.O., in her own right, and JULIE RUFFIN against Defendants TAMAYO and DOES 1-10]

52.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

53.     As set forth in the preceding paragraphs, which are incorporated herein by reference, individual defendants TAMAYO and DOES 1-10 were deliberately indifference to Pedro Junior's serious medical and mental health needs.

54.     Each Defendant caused the untimely, preventable, and wrongful death of Pedro Junior and deprived Plaintiffs of their liberty interest in their relationship with decedent, in violation of their substantive due process rights as defined by the Fourteenth Amendment to the United States Constitution.

55.     There was no legitimate penological interest in failing to medicate and treat Pedro Junior.

56.     There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical danger and distress.  There was no legitimate reason for refusing to provide psychiatric assistance and medication to Pedro Junior, despite his explicit request for such care. Pedro Junior requested such care on June 17, 2023. He did not hang himself until June 26, 2023. There was ample time to reflect, deliberate, and actually provide the psychiatric care requested by decedent.

57.     The deprivation of the rights alleged above has destroyed the constitutional rights of A.O. and JULIE RUFFIN to the society and companionship of decedent, which is protected by the substantive due process clause of the Fourteenth Amendment.

58.    The conduct alleged herein violated Plaintiffs' rights as alleged above, thereby legally, proximately, foreseeably and causing Plaintiffs A.O. and JULIE RUFFIN to suffer damages all to be shown in an amount according to proof at the time of trial.

### C. THIRD CAUSE OF ACTION

### *Monell* Municipal Liability Civil Rights Action (42 U.S.C. § 1983)
### [By Plaintiffs against Defendant County of San Diego]

59.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

60.    Plaintiff A.O. asserts this cause of action as Pedro Junior's successor in interest with regard to the violation of decedent's constitutional rights under the Fourteenth Amendment. Plaintiffs A.O. and JULIE RUFFIN also assert this claim individually with regard to their Fourteenth Amendment right to a relationship with decedent Pedro Junior.

61.    These constitutional violations were the actual and proximate result of certain de facto "policies", practices, and customs maintained by the County, including policies of omission or inaction, which are described as follows:

a. a *de facto* policy, practice, and custom of ignoring and failing to implement commonsense reforms, recommended by experts to remedy the record-setting inmate deaths and injuries in County jails;

b. The custom or practice of deficient screening and identification of mental health issues at intake. *See* ¶¶ 73-87.

c. The custom and practice of failing to properly continue medication for incoming inmates. *See* ¶¶ 88-95.

d. The custom and practice of failing to share and communicate critical information to coordinate care for seriously ill patients. *See* ¶¶ 96-104.

e. Policy of omission or inaction: the failure to promulgate a

15
COMPLAINT

constitutionally adequate policy and training for suicide prevention. *See* ¶¶ 105-118.

f.   The custom and practice of failing to adequately review in-custody deaths to prevent further deaths. *See* ¶¶ 120-131

g.   A *de facto* policy, practice, and custom of failing to properly train, supervise, and discipline Department personnel working in the County jails. *See* ¶¶ 130-136.

62.   Each practice and custom, as well as policies of inaction or omission, including allegations of deliberate indifference and causation, are specified and detailed in the following sections beginning at paragraph 73.

63.   External audits and reports by correctional experts have repeatedly warned the San Diego County Sheriff's Department of pervasive system-wide failures in the provision of healthcare causing an inordinately high rate of inmate death.

64.   On November 8, 2016, the San Diego Sheriff's Department sought to obtain accreditation with the National Commission on Correctional Health Care (NCCHC). The Sheriff's Department authorized the NCCHC to conduct an audit of its health delivery system to determine whether the Sheriff's Department met the compliance standards for NCCHC accreditation.

65.   In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails. All San Diego County jails failed to meet NCCHC's compliance standards.

66.   In 2015, Disability Rights California (DRC) opened an investigation into conditions at County jails In April 2018, DRC published its finding: "Suicides in San Diego County Jail: A System Failing People with Mental Illness." DRC experts identified twenty-four "Key Deficiencies" and provided forty-six recommendations to address deficiencies in the County's suicide-prevention and related mental health treatment delivery efforts.

67.    After the DRC issued its report in 2018, the Office of the County Counsel contacted correctional healthcare expert Lindsay Hayes and retained him to "independently assess *current* suicide prevention practices, as well as offer any appropriate recommendations for the revision of suicide prevention policies and procedures." In June 2018, Lindsay Hayes issued his report, which is discussed in the following sections.

68.    In February 2022, the California State Auditor issued a report after conducting an audit of 815 deaths in San Diego County jails. Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. . . .These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

69.    The State Auditor continued, "[t]he high rate of deaths in San Diego County's jails (as) compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

70.    The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services and concluded that lack of attention may have contributed to their deaths.

71.    The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

72.    State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years. "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

73. **The custom and practice of deficient screening and identification of mental health issues at intake**. The San Diego County Sheriff's Department maintained a custom and practice of inadequately screening incoming inmates for mental health issues during the intake process, making it difficult for seriously mentally ill inmates like Pedro Junior to obtain appropriate care and treatment.

74. The San Diego County Sheriff's Department does not utilize a mental health "gatekeeper" responsible for: (1) identifying an incoming inmate's serious mental health needs; (2) referring that person to a psychiatrist to be prescribed psychiatric medication; and (3) referring that person to a mental health clinician for development of a treatment plan.

75. In its report dated February 3, 2022, the State Auditor of California recommended the Sheriff's Department "[r]evise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them."

76. In its January 2017 report, the NCCHC noted that the San Diego County Sheriff's Department did not meet all compliance standard for mental health screening and evaluation. Specifically, the NCCHC noted there was no policy requiring mental health screening by qualified mental health professionals within 14 days of admission to the jail. The Sheriff's Department did not require inmate-patients to be asked all necessary mental health history and status questions. There was no log or tracking process to ensure mental health patients were being seen by mental health professionals.

77. The NCCHC further noted that there not enough mental health professionals employed at the Central Jail to provide necessary services. "It is recommended that the facility increase the number of mental health professionals to

a level that allows for adequate provision of mental health services in a timely manner and individual counseling as appropriate."

78.    The NCCHC recommended that nursing staff who were conducting mental health screenings during the intake process "be provided with training to ensure mental health needs are being identified appropriately."

79.    Furthermore, San Diego County, unlike other counties, does not have a coordinated county health system. There is no policy or practice requiring intake nurses to review medical and mental health history from the County's own health system. For example, although Pedro Junior received services through a County Mental Health clinic, there was no policy or practice requiring TAMAYO, the intake nurse, to review County mental health records. Intake nurses only rely on individuals to self-report their mental health history.

80.    In its February 2022 report, the State Auditor recommended the Sheriff's Department "[c]reate a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process."

81.    In 2018, Lindsay Hayes, a correctional healthcare expert specializing in suicide prevention, advised the Sheriff's Department that its nurses should review records related to previous detentions in San Diego County jails to independently assess suicide risk: ". . . regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System. As such, it is strongly recommended that determination of whether the inmate was 'on suicide precautions during prior confinement in a SDCSD facility?' should be independently verified through review of the JIMS by nursing staff."

82.    Additionally, Hayes recommended that "[n]ursing staff conducting intake screening should always review the inmate's 'alert' screen to verify whether

they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement[.]"

83.    In response to Hayes' recommendations, the Sheriff's Department stated it had made changes to system to allow "alerts" to be placed in the record-keeping software that would notify "both nursing and mental health providers of the patient's prior and current mental health staff." But in Pedro Junior's case, either alerts regarding his previous suicidal behavior were *not* placed in the system, or Defendants TAMAYO and DOES 1-10 ignored any alerts.

84.    The Sheriff's Department did not respond to Hayes' recommendation that nurses verify whether an inmate had previously been on suicide precautions at County jails through an independent review of the medical records.

85.    In fact, at the time of Pedro Junior's death, there was no requirement that intake nurses like TAMAYO review an inmate's previous medical history that is within the Sheriff's Department's own record keeping system. Although Pedro Junior's mental health history was well-documented in his medical chart within the Sheriff's Department, and he had a history of suicide precautions, as well as a history of taking psychiatric medication and receiving mental health services, neither TAMAYO nor any other medical provider reviewed decedent's medical chart. The custom and practice was to ignore information from previous incarcerations.

86.    The Sheriff's Department has been warned that incoming inmate-patients are less likely to disclose previous suicidal attempts or mental health history if there is inadequate privacy and confidentiality during the intake process. In his June 2018 report, Lindsay Hayes wrote that suicidal inmates may deny suicidal ideation "when questioned in a physical environment that lacks both privacy and confidentiality." He urged the Sheriff's Department to rectify the intake/booking process at the Central Jail because the arresting officer was frequently hovering near the inmate while the nurse asked questions regarding the individual's mental health – compromising both privacy and confidentiality.

87.    In this case, the Sheriff's Department's failure to maintain constitutionally adequate screening and intake processes for serious mental health issues caused grievous harm to decedent Pedro Junior. Although Pedro Junior had a history of mental health issues and suicide attempts that were documented in the Jail's own medical records system, no one reviewed that information. When Pedro Junior issued two separate requests for psychiatric evaluation and medication assistance, no one responded to his requests.

88.    **The custom and practice of failing to properly continue medication for incoming inmates.** The San Diego County Sheriff's Department sustained a pattern and practice of failing to continue prescribed medication for inmates coming into its jails.

89.    In his Rule 26 expert report in the *Dunsmore* matter, Dr. Stewart opined that, based on his review of records, San Diego County "does not reliably or effectively continue necessary psychiatric medication for newly-detained patients who were receiving care in the community prior to their detention." He noted that the "failure to continue or timely start a person on clinically necessary psychiatric medications when they arrive at the Jail is exceedingly dangerous and must be remedied as soon as possible. The 2023 suicides of Pedro Ornelas and Jonathan McDowell, each of which had unacceptable delays in the provision of medication upon arrival, demonstrate the dire consequences of such failures."

90.    Dr. Stewart explained the danger posed by failing to continue prescribed medication for inmates. First, mentally ill inmates who rely on psychiatric medication frequently decompensate if their medication regime is disputed. This poses the risk of worsening symptoms and risk of suicide. Second, a disruption of the medication regime "can actually exacerbate the underlying mental illness by altering brain physiology and causing an expansion of foci in the brain of the condition at issue. This is called the 'kindling phenomenon.'" Additionally,

disruptions in medication "make it more difficult to treat a patient's mental illness moving forward."

91.    In its 2017 report, the NCCHC informed that Sheriff's Department that "inmates who enter the Central Jail and are taking psychotropic medication frequently do not have that medication continued in a timely manner. This results in instability and risk for the inmate, for custody staff and for the facility." The NCCHC noted that psychiatrists had complained that though they requested laboratory reports (for example, to measure blood levels of psychotropic medication), they received such reports less than 50% of the time.

92.    In its April 2018 report, Disability Rights California (DRC) wrote in a report to the Sheriff's Department that it found "inmates have faced significant delays in receiving prescribed psychiatric medications. Such delays can be dangerous and lead to mental health decompensation. . . . We received reports, confirmed by the County, of problematic delays between prescription and arrival of a medication for patients."

93.    In February 2019, Michael Wilson died at the San Diego Central Jail after he did not receive prescribed cardiac medication to treat hypertrophic cardiomyopathy and congestive heart failure. Mr. Wilson entered the Central Jail on February 5, 2019. For the first six days of his incarceration, Mr. Wilson did not receive any of his cardiac medication, missing 36 doses. Over the next three days, he only received 6 of 18 doses of medication. On the tenth day, Mr. Wilson died.

94.    After Michael Wilson's death, plaintiff, the Estate of Michael Wilson, alleged the County failed to implement specific policies to ensure inmate-patients received prescribed medication. The district court denied summary judgment as to decedent's *Monell* claim against the County for failure to implement policies related to missed medication: "there is a genuine dispute of material fact as to whether Wilson's death would have been avoided had the County implemented a policy to check whether an inmate-patient with serious medical needs missed doses of

prescribed medications when put on notice of that possibility. . . . The jury could conclude that, had the County implemented such a policy, medical personnel would have learned how many doses of essential cardiac medication Wilson missed and notified a doctor or otherwise escalated his care, which could have averted his death." *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 3:20-CV-00457-RBM-DEB, 2023 WL 8360718, at *30 (S.D. Cal. Dec. 1, 2023), *aff'd sub nom. Jackson v. Germono*, No. 23-4408, 2024 WL 4144074 (9th Cir. Sept. 11, 2024). The Ninth Circuit subsequently affirmed the district court's order denying qualified immunity to the individual nurses who failed to ensure that Michael Wilson received his prescribed medication: "It is clearly established that a medical professional's inaction in light of a patient's known need for missed medication may constitute deliberate indifference." *Jackson v. Germono*, No. 23-4408, 2024 WL 4144074, at *1 (9th Cir. Sept. 11, 2024).

95.    In this case, there was no attempt made to ensure that Pedro Junior's psychiatric medication continued to be prescribed and administered once he entered the Central Jail on June 16, 2023. The custom and practice of failing to continue medication for seriously ill inmates caused serious harm to decedent.

96.    **Custom and practice of failing to share and communicate critical information to coordinate care for seriously ill patients.** Defendant County of San Diego maintained a custom or practice of failing to share and communicate critical information regarding the serious medical and mental health needs of inmates among jail personnel, including custody deputies, JPMU/classification staff, medical personnel, and mental health staff.

97.    In its April 2018 report, one of the "Key Deficiencies" identified by Disability Rights California's experts involved communication among jail staff. Specifically, the DRC found that: (1) The San Diego County Jail system has lacked an effective way for custodial staff and mental health staff to communicate about important changes in an inmate's status (e.g. results of court proceedings, "bad

news," impending transfers, etc.); and (2) The lack of standardization in clinical documentation has hampered effective communication between treating clinicians and other health care staff.

98.    The DRC noted that "[c]ommunication and coordination among custodial staff and health care staff regarding inmates at risk of suicide and psychiatric decompensation need improvement. Custodial staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff. Multidisciplinary teams should meet on a regular basis to discuss the status of inmates with significant mental health needs or who demonstrate significant suicide risk factors."

99.    In his June 2018 report, consultant Lindsay Hayes examined communication and coordination efforts within the Sheriff's Department. He recommended a "weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients."

100.    The Sheriff's Department rejected Lindsay Hayes' recommendation, stating it was not necessary.

101.    Before the death of Pedro Junior, the San Diego County Sheriff's Department was aware of this custom and practice of failing to communicate among medical staff and custodial staff at the jail due to previous incidents of serious harm to inmates. For example, in February 2018, Mr. Greer suffered a skull fracture and extensive injury to his brain after medical staff and custodial deputies did not communicate to coordinate care for Mr. Greer, who suffered from a seizure disorder. Medical staff failed to provide anti-convulsant seizure medication to Mr. Greer, which he had specifically requested during medical intake as he had been taking the medication for many years. The jail intake nurse then failed to communicate to correctional deputies that Mr. Greer suffered from a seizure

disorder and needed a housing accommodation (i.e., a lower bunk). Custodial deputies placed Mr. Greer placed on a top bunk. Mr. Greer suffered a seizure while on the top bunk because he had not received his anticonvulsant medication. He fell approximately six feet from his top bunk while suffering a seizure, causing a traumatic brain injury that permanently damaged his frontal lobe.

102.   In the matter of *Frankie Greer v. County of San Diego*, the district court denied the County of San Diego's motion for summary on plaintiff Greer's *Monell* claim regarding a custom and practice among jail staff of failing to communicate to coordinate care for seriously ill inmates: "Here, the Court finds that Plaintiff has pointed to evidence that the County knew that medical staff repeatedly failed to (1) properly follow up and provide the required medical treatment and (2) communicate and coordinate the care of these needs with the custodial staff. Plaintiff points to numerous instances of inmate deaths involving medical staff failures to follow up with proper treatment for medical needs identified during screenings." *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1078 (S.D. Cal. 2023). The district court observed that the "County was also on notice that medical staff repeatedly failed to communicate inmates' medical needs to custodial staff[]" based on the deaths of specific inmates, which had occurred before Mr. Greer's injury in 2018.

103.   Despite the knowledge that effective communication between departments was essential to prevent decompensation, suicide and self-harm among vulnerable inmates, the County failed to implement reasonable policies and procedures to ensure that all relevant staff had access to complete and current information about inmates' mental health status and treatment needs. The County failed to further train and supervise its staff to ensure they were timely and properly communicating information to coordinate care for seriously ill inmates.

104.   In this case, Plaintiffs' rights were also violated as an actual and proximate result of the County's custom. The Sheriff's Department's own medical

records documented that Pedro Junior had a history of mental health issues, suicide attempts, and treatment with psychiatric medications. Despite this information, medical and mental health staff did not tell custodial staff, classification officers, and housing deputies any information regarding Pedro Junior's background and history. No one warned deputies of Pedro Junior's risk of suicide. Rather than communicating to understand how medical and custody could work together to improve care for Pedro Junior, and provide safe conditions for his housing and confinement, Pedro Junior was given access to material to create a ligature, which he used to hang himself.

105. **Policy of omission or inaction: failure to promulgate constitutionally adequate policy and training for suicide prevention**. The Sheriff's Department has long failed to adequately train its staff regarding suicide prevention and has failed to implement robust policies to prevent suicide, despite repeated warnings from outside agencies.

106. In January 2017, the NCCHC advised the Sheriff's Department that suicide prevention measures at the Central Jail were woefully inadequate. The NCCHC concluded there was "inadequate training, evaluation, monitoring, review, and debriefing" in the Sheriff's Department suicide prevention program.

107. The NCCHC wrote a "review of inmate charts indicated inappropriate assessment of suicide risk. It appears that the clinicians do not maintain an awareness of suicide risk over time, instead judging or evaluating each incident as being isolated from the individual's history within the facility and within the community." Clinicians were making risk assessments for inmates that "do not follow from the current and historical data" for those inmates. "This results in insufficient or inaccurate designations of suicide risk, and ultimately a higher risk of inmates attempting or completing suicide."

108. The NCCHC noted that the rate of suicide at the Central Jail in 2016 was nearly three times the national average. At George Bailey Detention Facility,

the combined average rate of suicide for 2015 and 2016 was nearly five times the national average.

109.  The NCCHC reported that sworn staff members (e.g. deputies) were not trained in suicide prevention and mental health clinicians were not trained to assess and manage suicide risks in jail. The NCCHC specifically recommended that "sworn staff receive annual suicide prevention training and that mental health clinicians (psychiatrists, psychologists and master's level clinicians) receive training on suicide prevention in corrections to ensure they are appropriately identifying and classifying those inmates who are at risk of suicide."

110.  The DRC's report in April 2018 echoed the NCCHC's concerns. DRC's experts noted in the report that "documentation of risk evaluations has been poor and inconsistent, hindering effective treatment and continuity of care among providers and between jail facilities." The DRC report found that "[m]ental health staff do not adequately consider previous risk evaluations and changes to inmates' conditions during the course of confinement."

111.  DRC observed that there was no standardized policy or procedure at the Sheriff's Department regarding placing, monitoring and releasing inmates from suicide monitoring. The DRC noted that the Department's policies should give specific direction to its staff about placing and assessing inmates in enhanced observation housing for monitoring of suicide risk.

112.  DRC's experts further found a key deficiency to be the absence of individualized mental health treatment plans for each seriously ill inmate: "[i]nmates who have required mental health treatment and remained in custody for significant periods do not have individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming." DRC noted that individualized treatment plans that identify mental health problems, treatment goals, and a plan to accomplish those goals were required by Title 15, section 1210 of the California Code of Regulations.

113.   In his June 2018 report to the County of San Diego, correctional health expert Lindsay Hayes informed the County that the absence of any treatment plan for inmates at risk of suicide contravened national standards and best practices. Hayes specifically recommended revising the County's policies and procedures to require "all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment."

114.   Furthermore, Lindsay Hayes recommended the Sheriff's Department create a "mental health triage and referral protocol." He recommended the following schedule for referrals to providers and risk designations: "Emergent - immediate or within 1 hour; Urgent - within 24 hours; and Routine - within 72 hours. In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level."

115.   The Sheriff's Department declined to implement this recommendation by Lindsay Hayes. Even if Pedro Junior's requests for psychiatric assistance and medication continuation had only been marked "routine" he would have seen a psychiatrist within 72 hours of June 17, 2023 had the protocol Lindsay Hayes recommended been implemented by the Sheriff's Department.

116.   DRC's April 2018 report also noted numerous deficiencies in staff training on suicide prevention. The DRC wrote the Sheriff's Department's "training programs for custodial and medical/mental health staff is not well coordinated. It is not clear what the training schedule is, what the training requirements are, how training records are kept, and how trainings should be evaluated." The DRC observed there is "no consolidated training program that

encompasses all aspects of suicide prevention, including suicide warning sign awareness, how to work with inmates with mental illness, principles of suicide risk assessment, correctional suicide prevention, treatment of suicidal inmates, and emergency response." The DRC recommended implementation of a system that "tracks trainings and ensures that all staff are current on required trainings."

117.  The DRC also found deficiencies in the clinical documentation of patients at risk of suicide. "Risk assessments were often brief and did not include important information about the inmates, such as history of suicidal behavior or protective factors, and were often shortened to 'Denies SI' (suicidal ideation)." The DRC recommended additional training for mental health clinicians: "[m]ental health should have specific suicide risk assessment training that adopts best practices in training, such as the Recognizing and Responding to Suicide Risk course from the American Association for Suicidology. The training should be included in onboarding for new employees and should be required periodically for current staff."

118.  The Sheriff's Department's policies and training were deficient and inadequate for inmates like Pedro Junior who were at risk of suicide. Mental health providers were not trained about suicide risk and management in correctional settings. The failure of the Sheriff's Department to promulgate appropriate policies and to provide adequate training inflicted serious harm and injury to Pedro Junior.

119.  **Deliberate indifference: San Diego County evidenced deliberate indifference to inmates' serious psychiatric needs because it knew that seriously mentally ill inmates were dying at San Diego jails due to neglect.** The San Diego County Sheriff's Department was aware that neglecting the serious mental health needs of inmates was causing preventable deaths. The following individuals died in the custody of the San Diego Sheriff's Department due to serious mental illness that was recognized by jail staff but not properly treated within County jails:

a. In 2014, **Christopher Carroll**, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had smeared blood on the wall of his cell. He had urinated on the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to check for his wellbeing despite Mr. Carroll's known condition.

b. In 2015, **Ruben Nunez**, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to continue treatment and monitoring for a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez at the Central Jail failed to read his medical records from Patton to recognize that he was on a pre-existing treatment plan.

c. In 2015, **Christopher Cook**, an inmate at the Vista Detention Facility, put his legs over the railing of the jail's second floor and fell headfirst onto the concrete below. He died on December 1, 2015 as a result of his injuries.

d. In 2016, **Heron Moriarty** was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself. In August 2020, a whistleblower within the Sheriff's Department, Jeanette Werner, came forward to describe Mr. Moriarty's "howls" which filled the jail and sounded "like a wounded animal crying out for help." Werner confronted a sergeant, Weidenthaler, who refused to place Moriarty in a safety cell. When Werner persisted, insisting she

could quickly prepare the necessary paperwork to place Moriarty in a safety cell, the sergeant ordered her to "stand down." That evening, Mr. Moriarty used two t-shirts to choke himself. Later, Weidenthaler instructed Werner not to tell anyone about their conversation.

e. In 2016, **Jason Nishimoto** killed himself with a bedsheet on his fourth night in jail, the evening before he was scheduled to see a psychiatrist. His psychiatric condition was well known to the Jail staff, who ignored it. Ms. Werner told a county investigator that county officials had altered documents in this case.

f. In February 2018, **Paul Silva** died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in the Jail's database system. Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication. Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours. The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions. Deputies killed Paul Silva after they entered his jail cell in an attempt to remove him from his jail cell.

g. In 2019, **Ivan Ortiz** died by suicide in San Diego Central Jail. Mr. Ortiz had previously told staff he was feeling suicidal, and he had at least one documental suicide attempt while in County custody. The County of San Diego's Citizen Law Enforcement

31
COMPLAINT

Review Board concluded that "staff failed to keep a suicidal inmate safe from self-harm and the conduct was not justified." A deputy failed to remove an object that could be used for self-harm in Mr. Ortiz's cell, and Mr. Ortiz used the object to hang himself.

h. In November 2019, **Matthew Godfrey**, who suffered from serious mental illness, died in a filthy administrative segregation cell at the Central Jail. He was found with torn clothing around his neck and rope in his pants.

i. In May 2020, **Joseph Morton** committed suicide after being placed in the isolation cell for five days at the Vista Detention Facility.

j. In 2021, **Lester Daniel Marroquin** died by suicide hours after being transferred to an administrative-segregation cell in San Diego Central Jail.    Previously, the Sheriff's Department repeatedly refused to produce Mr. Marroquin for his court-ordered psych evaluations.    Marroquin cycled in and out of administrative segregation and safety cells for months, as his mental health seemed to worsen. He attempted to end his own life twice in April 2021 and experienced hallucinations that made him believe he could talk to his mother through the toilet in his cell and uncontrollably drink water from the toilet bowl.  On May 30, 2021, Marroquin was again transferred to an administrative segregation cell, where he began drinking water from the cell's toilet and died from water intoxication.

k. In March 2022, **Lonnie Rupard** died in San Diego Central Jail while in administrative segregation.  From the time Mr. Rupard was taken into custody until his death, he suffered a 60-pound

weight loss, or 36% of total body weight. Mr. Rupard's cell was covered in trash and feces, and jail staff failed to intervene and assess Mr. Rupard's medical needs. Rupard continuously refused prescription medications which were ultimately canceled due to his repeated refusals. Medical staff repeatedly postponed Mr. Rupard's care due to time constraints or for Mr. Rupard's refusal. Mr. Rupard's cause of death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia.

l.  In August 2022, **Matthew Settles** committed suicide while housed in administrative segregation. Matthew Settles suffered from schizoaffective disorder. He was gravely disabled and subject to a permanent conservatorship. Despite his permanent conservatorship, he was allowed to refuse medical care and make decisions for himself. He did not receive regular psychiatric evaluations or assistance. He was not given his prescribed psychotropic medication. As he decompensated, he was placed in administrative segregation in conditions of such extreme isolation and restriction that he committed suicide.

m.  In July 2023, **Jonathan McDowell** committed suicide while in administrative segregation at George Baily Detention Facility, much like Matthew Settles. Mr. McDowell had to wait over three months to be seen by a psychiatric provider, despite clear documented signs that he needed urgent psychiatric care. Mr. McDowell was placed in restrictive solitary confinement at George Bailey, where he deteriorated further and did not receive the medical treatment and monitoring that he required. Mr.

McDowell died a preventable death due to egregious failures to provide adequate mental health treatment.

///

120. **Custom and practice of failing to adequately review in-custody deaths to prevent further deaths**. To detect systemic problems in the delivery of health care and to avoid adverse outcomes such as in-custody deaths, there must be a rigorous review of each death to identify common or recurring issues. As discussed in the State Auditor's Report of February 2022, San Diego County has more in-custody jail deaths than similarly situated counties. Despite the soaring rate of inmate deaths, San Diego has failed to conduct thorough and robust reviews of inmate deaths to identify and rectify systemic problems.

121. Section 1046 of Title 15 of the California Code of Regulations requires detention facilities to "conduct an initial review and complete a written report of every in-custody death within 30 days of the death. The team that conducts the initial review shall include, at a minimum, the facility administrator or designee, the health administrator, the responsible physician and other health care, and supervision staff who are relevant to the incident. **Deaths shall be reviewed to determine the appropriateness of clinical care; whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study**." (Emphasis added.)

122. Similarly, the NCCHC has a standard entitled, "Procedure in the Event of an Inmate Death." This NCCHC standard requires: (1) a clinical mortality review to be conducted within 30 days that assesses the clinical care provided and the circumstances leading up to the death; (2) an administrative review conducted with custody staff that assesses correctional and emergency response actions surrounding an inmate's death; and (3) a psychological autopsy for suicides conducted within 30 days that "is a written reconstruction of an individual's life with an emphasis on

factors that led up to and may have contributed to the death. It is usually conducted by a psychologist or other qualified mental health professional."

123.  The NCCHC standard (2018 edition) explains that a clinical mortality review "is conducted to determine the appropriateness of the clinical care provided and the effectiveness of the clinical policies and procedures relevant to the circumstances surrounding the death. Generally, a clinical mortality review asks at least three key questions: Could the medical response at the time of death be improved? Was an earlier intervention possible? Independent of the cause of death, is there any way to improve patient care?"

124.  According to the NCCHC, "[c]orrective actions identified through the review process are implemented and monitored through the quality improvement program for systemic issues and through the patient safety program for staff-related issues. . . . **Results of reviews are communicated to health staff for lessons learned to be shared with treating staff to prevent similar situations in the future**." (Emphasis added.)

125. In its 2017 Technical Audit of the San Diego County Sheriff's Department, the NCCHC reported that in custody death reviews were not being conducted in a timely manner; that psychological autopsies of suicide deaths were not being completed; and that treating physicians and health staff were "not being informed of any results of death reviews in their facilities."

126.  The NCCHC recommended the Sheriff's Department begin conducting psychological autopsies of all suicides and conduct timely reviews of in-custody deaths. It further advised: "**Treating and general health staff must be informed of the review findings**. Maintaining a log of dates of the death, review, and autopsies and sharing with staff would assist in tracking activities for purposes of compliance. When the results are shared with staff, an email response is a good method to make sure all staff have benefited from these reviews." (Emphasis added.)

127.  In February 2022, the State Auditor of California made the following recommendations to the San Diego County Sheriff's Department regarding its review of in-custody deaths:

> To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:
>
> • Staff will provide a written report of each 30-day medical review to its management.
> • When warranted, the report should specify recommendations for changes to prevent further deaths.
> • The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.
>
> To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.
>
> To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings[1] **or**

---

[1] The San Diego County Sheriff's Department has insisted that Critical Incident Review Board documents are attorney-client communications protected by privilege because "the primary purpose of the CIRB [is] assessing legal liability for a past evident and avoiding legal liability for future similar events." *Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1226 (9th Cir. 2025). As such, CIRB reports cannot be used to determine the appropriateness of clinical care within the meaning of Section 1046 of Title 15 of the California Code of Regulations. Nor can CIRB reports be used as clinical mortality reviews within the meaning of the NCCHC

36

COMPLAINT

**to establish a separate public process for internally reviewing deaths and making necessary changes**.

(Emphasis added.)

128.   Despite the warnings and advice of the NCCHC and State Auditor, and despite the mandatory requirements of Title 15, the San Diego County Sheriff's Department persists in failing to conduct adequate mortality reviews of in-custody deaths; fails to notify health services staff of any significant findings; and fails to implement methods to prevent further death and harm to inmates.

129.   The Sheriff's Department maintained a pattern and practice of failing adequate mortality reviews of in-custody deaths that identified common, recurring deficiencies. It did not communicate to all medical and mental health staff recurring deficiencies. It made no effort to improve the delivery of medical and mental health services. The Sheriff's Department failed to conduct any mortality review of the following in-custody deaths in accordance with the requirements of section 1046 of Title 15 of the Code of Regulations, and failed to communicate with medical and mental health staff regarding any deficiencies in the medical and/or mental health care provided to the following decedents:

      a.   Daniel Sisson, who died on or about June 25, 2011

      b.   Bernard Victorianne, who died on or about September 19, 2012

      c.   Kristopher NeSmith, who died on or about March 1, 2013

      d.   Ronnie Sandoval, who died on or about February 23, 2014

      e.   Jerry Lee Cochran, who died on or about September 16, 2014

      f.   Ruben Nunez, who died on or about August 13, 2015

      g.   Jason Nishimoto, who died on or about September 27, 2015

      h.   Richard Boulanger, who died on or about February 14, 2016

---

standard to communicate deficiencies to all medical and mental health staff to prevent future adverse outcomes as the Sheriff's Department employs mental health and medical contractors who are not employees.

i.  Adrian Sanchez, who died on or about May 3, 2016

j.  Heron Moriarty, who died on or about May 31, 2016

k.  Bruce Madsen Stucki, who died on or about March 18, 2017

l.  Stephen George, who died on or about April 25, 2017

m. Wellington Robert Kemplin, who died on or about August 15, 2017

n.  Michael Macabinlar, who died on or about September 25, 2017

o.  James Kenyon, who died on or about November 2, 2017

p.  Shameka Phillips, who died on or about November 20, 2017

q.  Joseph Horsey who died on or about December 24, 2017

r.  Paul Silva, who died in February 2018

s.  Oscar Leal who died in February 2018

t.  Michael Gomez, who died on or about July 10, 2018

u.  Manual Cruz, who died on or about October 2, 2018

v.  Michael Wilson, who died on or about February 14, 2019

w. Dennis Curry, who died on or about May 13, 2019

x.  Jeremy Thomas, who died on or about May 29, 2019

y.  Julio Ortiz Lopez, who died on or about August 26, 2019

z.  Daniel Pickett, who died on or about September 7, 2019

aa. Matthew Godfrey, who died in November 2019

130.  Furthermore, the NCCHC's 2017 report noted that it had reviewed in-custody deaths for a two-year period and the Sheriff's Department had failed to conduct any psychological autopsy of suicides. Upon information and belief, the Sheriff's Department did not complete any psychological autopsy of the following deaths of individuals in San Diego County jails, all of whom committed suicide:

a.  Vidal Abraham Webb (2014 suicide)

b.  Hector Lleras (2014 suicide)

c.  Christopher Carroll (2014 suicide)

d.  Kristopher Nesmith (2014 suicide)

38
COMPLAINT

e.   Nicholas Medel (2015 suicide)

f.   Martin Dozal (2015 suicide)

g.   Sergio Valenzuela (2015 suicide)

h.   Christopher Cook (2015 suicide)

i.   Sergio Almejo (2016 suicide)

j.   Nicholas Helton (2016 suicide)

k.   Heron Moriarty (2016 suicide)

l.   Jason Nishimoto (2016 suicide)

m.   Chadwick James Moore (2017 suicide)

n.   Frederick Jefferson (2018 suicide)

o.   Michael Patrick Sullivan (2018 suicide)

p.   Jon Eric Nelson (2018 suicide)

q.   Manuel Gomez Cruz (2018 suicide)

r.   Ivan Ortiz (2019 suicide)

s.   Joseph Morton (2020 suicide)

t.   Lester Marroquin (2021 suicide)

u.   Matthew Settles (2022 suicide)

v.   Jonathan McDowell (2023 suicide)

131.  The Sheriff's Department failure to thoroughly review each in-custody death to identify systemic failures and deficiencies in the delivery of medical and mental health care prevents it from taking remedial action to prevent deaths. Its failure to respond to the repeated deaths of inmates in its custody evidences deliberate indifference to the Constitutional rights of inmates such as Pedro Junior.

132.  **Collective inaction**. The County is further liable because the cumulative and persistent failures and misdeeds of the entire Sheriff's Department at the Central Jail caused the ultimate injury and harm suffered by decedent Pedro Junior. Plaintiffs' constitutional deprivations were not only caused by the conduct of individual officers, but also resulted from the collective inaction of the San Diego

County Sheriff's Department.  Plaintiffs' constitutional deprivations were further caused by the subordinates' adherence to customs and practices as alleged herein. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

133.  For at least six years leading up to Pedro Junior's death, the County's final policymakers were on notice of the foregoing policies and practices including the fact that these policies and practices were (and are) causing a disproportionate number of deaths and injuries to people in County jails.  By failing to implement any reasonable policy changes in response to this crisis, the County has remained deliberately indifferent to the constitutional rights of people in the County's care and custody.

134.  If the County is going to take into its custody individuals with serious health issues, the County must provide them with adequate care.  The County has, however, consistently failed to provide adequate training, supervision, and resources for its jail staff.

135.  Despite the frequency with which Sheriff's Department personnel must work with individuals suffering from mental health issues, for example, jail staff know little if anything about mental healthcare.  As such, jail staff frequently leave such individuals unattended, unmonitored, and—even worse—in dangerous situations with obviously dire consequences.

136.  The County's final policymakers failed, in summary, to provide adequate training, supervision, and resources necessary for jail staff to perform their duties without violating the constitutional rights of, not only the people in the County's care and custody, but these individuals' spouses, children, and parents, as well.

137.  Even after the County's final policymakers were provided with official reports from multiple oversight organizations, notifying them of the dangerous

conditions in County jails, policymakers failed to give jail staff the training, supervision, and resources needed to address the problems raised by these oversight organizations.

138. As set forth in the preceding paragraphs of Plaintiff's complaint, which are incorporated herein by reference, Defendant County knew of these unconstitutional practices and customs inflicting grievous injury to vulnerable inmates. The County tolerated constitutionally deficient customs and practices of its subordinates related to the care of seriously ill inmates. Defendant County of San Diego and each of its subordinates were deliberately indifferent to the mental health needs of Pedro Junior. These systemic failures and unconstitutional practices were the moving force behind the misconduct of subordinates and the denial of medical care to Pedro Junior, inflicting prolonged pain and suffering to decedent, causing his death, and depriving Plaintiffs of the care, comfort, society, and companionship of decedent.

### D. SIXTH CAUSE OF ACTION

**Violation of Cal. Civil Code § 52.1 (Bane Act) – Survival Claim**
**[By A.O., as successor in interest to Decedent Pedro Junior Ornelas III, against Defendants 1-10]**

139. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

140. Plaintiff A.O., as successor in interest to Decedent Pedro Junior, brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civil Procedure, § 377.20 et. seq.

141. By their acts, omissions, customs, and policies, Defendants DOES 1-10, each Defendant acting in concert/conspiracy, as described above, by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Pedro Junior's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

a. The right to be free from objectively unreasonable treatment and deliberate indifference to Pedro Junior's serious medical needs while in custody as a pre-trial detainee, as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

b. Decedent's right to familial association as secured by the First and/or Fourteenth Amendments;

c. The right to enjoy and defend life and liberty; acquire, possess, and protect properly; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

d. The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

e. The right to emergency medical care as required by California Government Code § 845.6.

142.  As alleged above, Defendants' violations of Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

143.  All of Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

144.  Further, each Defendant violated Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.  Each defendant acted with reckless disregard for Pedro Junior's rights.

145.  Defendant NAPHCARE is vicariously liable for the violation of rights by their employees and agents.

146.  As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California

Constitutions, Plaintiff sustained injuries and damages.  Against each and every Defendant is entitled to relief as set forth above, including punitive damages against all individuals Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs, attorneys' fees, treble damages and civil penalties.

## E. SEVENTH CAUSE OF ACTION

### Negligence Survival Claim (CCP § 377.30)
### [By A.O., as successor in interest to Decedent Pedro Junior Ornelas III, against Defendants NAPHCARE and DOES 1-10]

147.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

148.  Defendants DOES 1-10 failed to properly treat Pedro Junior for his serious mental health needs and Plaintiff asserts a medical malpractice claim against these defendants. Defendants had a duty to Pedro Junior to act with ordinary care and prudence so as not to cause harm or injury to another. In evaluating, assessing and handling Pedro Junior's medical condition, Defendants failed to comply with professional and legal standards.

149.  Defendant NAPHCARE failed to properly train, supervise, and monitor its employees regarding the care of severely mentally ill inmates like Pedro Junior. NAPHCARE failed to establish and enforce adequate policies regarding the care and treatment of seriously mentally ill inmates, and timely provision of medical and mental health services upon an inmate's request. NAPHCARE failed to establish and enforce adequate policies regarding suicide assessment, suicide monitoring, and risks of suicide in a correctional setting.

150.  Plaintiffs are not aware of the identities or conduct of DOES 1-10, nor were they aware of DOES' identities at the time of Pedro Junior's death because these Defendants were private contractors who were not employed by the County of San Diego. Plaintiff only discovered the involvement of NAPHCARE as a result

of the expert report of Dr. Stewart in the *Dunsmore* action. Plaintiff's counsel Grace Jun first viewed that report on May 21, 2025.

151. Plaintiff's complaint against NAPHCARE and DOES 1-10 were all filed within one year of the differing dates of discovery of the respective acts of each Defendant in compliance with California Code Civ. Proc. § 340.5.

152. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Pedro Junior.

153. Defendant NAPHCARE is vicariously responsible for the acts of its individual agents and employees, including DOE DEFENDANTS.

154. As a direct and proximate result of the Defendants' negligent conduct as herein described, Pedro Junior died.

## F. EIGHTH CAUSE OF ACTION
### Wrongful Death (CCP § 377.60)
### [By A.O. against Defendants NAPHCARE, and DOES 1-10]

155. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

156. As set forth in the preceding paragraphs, Defendants committed wrongful acts which proximately caused the death of Pedro Junior. Specifically, all Defendants, deprived Pedro Junior of his rights under the United States Constitution and California Constitution to adequate medical and mental health care and to safe conditions of confinement. These acts resulted in his death.

157. Defendant NAPHCARE is vicariously responsible for the acts of its individual agents and employees, including DOES.

158. The wrongful acts alleged above has destroyed the relationship between Plaintiff A.O. and decedent Pedro Junior and has legally, proximately, foreseeably and caused damages, including the loss of society, companionship, care, comfort, guidance and support, and further economic and non-economic damages according to proof at the time of trial.

# VI.   PUNITIVE DAMAGES

The conduct of all individual defendants as alleged herein was malicious, oppressive, fraudulent, and in reckless disregard of decedent's federally guaranteed rights.   Plaintiffs seek punitive damages to punish and deter such conduct, as alleged in this complaint.

# VII.   PRAYER FOR RELIEF

Plaintiffs prays for judgment as follows:

1) For compensatory general and special damages in an amount in accordance with proof.

2) For punitive and exemplary damages as permitted by law.

3) For attorney's fees, expenses and costs of suit as permitted by law.

4) For any other relief that is just and proper.

# VIII. JURY TRIAL DEMAND

Pursuant to Rule 38 Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution, Plaintiffs demand a jury trial.


DATED: June 27, 2025                     Respectfully submitted,


s/ Julia Yoo
**JULIA YOO**
*Attorney for Plaintiff A.O*


/s Grace Jun
**GRACE JUN**
*Attorney for Plaintiff Julie Ruffin*